UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

UNITED STATES OF AMERICA

          -against-

CHRISTOPHER MARINO,

          Defendant.

------------------------------------------------------------------------x

Docket No.

20 Cr. 160 (MKV)

## SENTENCING MEMORANDUM FOR
## DEFENDANT CHRISTOPHER MARINO

*Attorney for Defendant*:

KARLOFF C. COMMISSIONG, ESQ.
90 Broad Street, 2nd Floor
New York, New York 10004
(212) 430-6590

KARLOFF C. COMMISSIONG, ESQ.

ATTORNEY AT LAW
90 BROAD STREET, 2ND FLOOR
NEW YORK, NY 10004
TEL: 212-430-6590
FAX: 212-981-3305

April 25, 2024

**VIA ELECTRONIC MAIL**
**TO BE FILED UNDER SEAL**

Hon. Mary Kay Vyskocil
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   United States v. Christopher Marino, Docket. No. 20 Cr. 160 (MKV)

Dear Judge Vyskocil:

    This letter is submitted as Christopher Marino's sentencing recommendation. ███████████████████████████████ Christopher Marino pleaded guilty to a one-count superseding information charging Conspiracy to Commit Misbranding and Drug Adulteration, pursuant to 18 U.S.C. §371.  Christopher Marino requests that the Court impose a sentence, at variance with the Guidelines, of time served and 1 year of supervised release pursuant to the Court's authority under 18 U.S.C. §3553(a) and United States v. Booker, 543 U.S. 220 (2005).

## I.   PRELIMINARY NOTE

    According to 18 U.S.C. §3553(a), this Court is required to impose a sentence which is sufficient but not greater than necessary to reach the sentencing goals of Congress.  Those goals include providing just punishment, protecting the public from the future crimes of the offender and providing necessary vocational and rehabilitative needs of the offender.  See 18 U.S.C. §3553(a)(2).  This submission focuses upon the background, history and circumstances of

Christopher Marino. See 18 U.S.C. §3553(a)(1). [1] Counsel strongly believes that when the Court reviews the circumstances of Christopher Marino's life, including a steady employment history, his resilience and █████████████████████████████████████████ ███████████████████████████████████████ a total sentence of time served and 1 year of supervised release is warranted.

**II.** ████████████████████████████████████████████████

It should be said at the outset, that Christopher Marino participated in an offense that as the Court has noted: "was reckless and it was irresponsible and it put at risk the horses under h[is] care, the horses against whom those horses were competing, and the riders of those horses, who potentially could have been killed if there were a serious accident on the track. See Erica Garcia Sen. Tr., p. 32 at Dkt. No. 1027. Christopher, "participated in the conspiracy by receiving and administering misbranded and adulterated PEDs", and helped to hide one horse, "Northern Virgin from NJRC officials." See P.S.R. at ¶¶ 43 and 46(b). However, ████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[1] Christopher Marino's personal and family histories are detailed in the P.S.R. at ¶¶ 126-136, and his mental and emotional health, substance abuse, education and vocational skills, employment and financial condition are discussed at ¶¶ 137-165.

3

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

### III. CHRISTOPHER MARINO'S PARTICIPATION IN THE INSTANT OFFESNSE IS AN ABERATION IN AN OTHERWISE LAW-ABIDING, FOCUSED AND RESILIENT LIFE

*Christopher's Love of Working with Horses becomes the Defining Factor of His Life*

At a time when most teenagers were discovering themselves, figuring out who they were and what they wanted to do with their lives, 16-year-old Christopher Marino already knew what he wanted to do. He wanted to train horses. It was a childhood "dream come true" that became a career and a lifelong passion.

Christopher was 10 years old when his parents, John Marino and Barbara Colton divorced. At the time, John worked as a blacksmith, making horseshoes. Christopher would spend time with John on the weekends, going with him from farm to farm, while John would put shoes on different horses. It was during these trips that Christopher first became enamored with the idea of working with horses. This infatuation would continue to grow and develop. When Christopher was in junior high school, at the age of 12, he traveled to school on a school bus, and became friendly with the bus driver. Christopher found out that his bus driver's husband, Ed Morris, was a racehorse trainer. He convinced his mother to allow him to work with Ed Morris during the next several summers. This was a dream job for Christopher, who enjoyed every minute of working with the horses. Christopher's infatuation became a deep focus, and at 16-years-old, he made a significant life-decision. He decided to leave school.

As a junior in high school, Christopher found his calling in life, and convinced Barbara to give him permission to leave school and begin a career working with horses. Christopher

began cleaning horse stables, then grooming the horses, and eventually training the horses. Once he quit school to pursue his passion, Christopher began full-time employment with Ed Morris until he was 20 years old. See P.S.R. at ¶159. Enthusiastic and ambitious about his passion, Christopher subsequently found work as a horse groomer in New Jersey for a New Jersey horse trainer, Chris Petro. Id. Enthusiasm and ambition led Christopher to founding his own stables, Marino Stables, which Christopher started in 1990 and owned until 2018. Id. Although his income could be unstable, Christopher's love for training horses did not wane.

While his passion remained, there were real world difficulties – running a business was not for the faint of heart. At the height of his business, Christopher owned two to three horses. Id. at ¶158. It became overwhelming for Christopher, and he shut down his business. Subsequently, Christopher began helping Nick Surick, a main participant in this conspiracy, with his stable. Christopher's decision to work with Nick proved to be life changing. Christopher was in a vulnerable position. The stress of running a business took its toll and Christopher needed to support himself and wanted to do so while continuing to train horses. As a result, Christopher became involved in the instant offense, allowing his vulnerable financial position to lead him into circumstances that would nearly destroy his life.

At the time of his arrest, Christopher was 57 years old. By that time, he had spent more than 40 years working with horses. However, as a result of his participation in this conspiracy, Christopher was forced to give up his passion. He could not work with horses any longer. Christopher has been devastated. He has realized that what he has done was wrong, and that he hurt the animals that he had dedicated his life to loving. The emotional upheaval was unimaginable. But Christopher had to reinvent his life.

Shortly after his arrest, Christopher immediately found work at ShopRite in the produce section but lost it because it was too physically demanding. Id. at 156. While briefly unemployed, one of Christopher's friends, Julie Tedford, asked him to help out with a junk removal/clean out company in which she was involved. Subsequently, Julie recommended Christopher to their mutual friend, Jennifer Padula, who had a position for permanent employment at Jennifer's junk removal/clean out company, Consider It Done, Inc. Id. at 155. Christopher has been working as a foreman at the company's jobsites. Id. Additionally, Christopher, "sees what items can be repurposed and works as a self-employed eBay seller where he resells the items on eBay." Id. Christopher has successfully reinvented his life and shown the kind of resilience necessary to get back onto the path of being a productive, law-abiding individual that this Court can trust.

*A Lifetime of Resilience*

Christopher has been resilient his entire life and has gone through periods where he has had to reinvent himself out of necessity. He was in his late teens when he realized that he was homosexual. However, he hid this truth, even getting married to Deborah Wardell in his early twenties. After just a few years of marriage, he would divorce Deborah Wardell, while in his mid-twenties. By this time, Christopher had come to terms with his homosexuality, and even had a few relationships.

When Christopher was around 37 or 38 years old, ███████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

6

███████████████████████████████████████

██████████

It is clear that Christopher's response to adversity throughout his life has been positive, productive and thoughtful. The Court should consider this aspect of his character and life when sentencing him in this matter.

### V. A GUIDELINES SENTENCE DEFEATS THE PURPOSE OF INCARCERATION

*Deterrence to criminal conduct*

While many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. Further, there is no evidence that increases in sentence length reduce crime through deterrence. Empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects...Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006).

Another problem with justifying punishment as a means to deter others, besides its ineffectiveness, is that it is immoral to punish one person merely to promote deterrence of others. "Juridicial punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one

man ought never be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, The Science of Right 195 (W. Hastie trans., 1790).

*Christopher Marino's vulnerability to abuse in prison*

Christopher is more likely than the typical defendant to be a victim of sexual violence in prison. See United States v. K, 160 F. Supp. 2d 421, 443–44 (E.D.N.Y. 2001)(A defendant's physical and emotional fragility, which makes him or her far more likely than the typical offender to suffer sexual violence in prison, may also be considered in determining whether deferment of sentencing with an eye toward crafting alternatives to incarceration is appropriate. See Kevin N. Wright, The Violent and Victimized in Male Prison, 16 J. of Offender Rehabilitation 1, 6, 22 (1991) (sociological studies show that victims of physical, and in particular, sexual assault, in male prisons "tend to be [ ]small, young, and middle class ... lack mental toughness and are not 'street-wise' ... appear to be less involved in a criminal culture before incarceration and to have less institutional experience"); Peter L. Nacci & Thomas R. Kane, Inmate Sexual Aggression: Some Evolving Propositions, Empirical Findings, and Mitigating Counter-Forces 9 (1984) (studies of rape in federal prisons reveal that "the target is singled out by assailants quickly as one who (1) is generally weak and exploitable and (2) 'appropriately' feminine. This volatile combination of circumstances, coupled with the fact that the environment is geographically restricted and avoidance is difficult makes the case of sex pressuring mortally dangerous.")). It is critical that this Court considers this information when determining the type of life to which Christopher is being sentenced.

*The need to avoid unwarranted sentence disparities*

There were two defendants, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ who received time served in this matter, Ross Cohen and Henry Argueta. Christopher, who is in

8

Criminal History Category I, with a criminal history score of zero, has no greater culpability than either of those defendants. When analyzing the culpability of Ross Cohen, we see conduct with respect to the distribution of misbranded and adulterated PEDs, that goes back to 2001. Henry Argueta accepted responsibility to a wider range of conduct in this matter, as evident by his plea to a superseding information that included the following counts: 1) Conspiracy to Commit Misbranding and Drug Adulteration, pursuant to 18 U.S.C. §371; 2) Attempt and Conspiracy to Commit Wire Fraud, pursuant to 18 U.S.C. §1349; and 3) False Statements Relating to Health Care Matters, pursuant to 18 U.S.C. §1035. When juxtaposed against Ross Cohen and Henry Argueta, time served is an appropriate sentence for Christopher, with respect to his level of culpability ███████████████████████. See United States v. Willis, 476 F.3d 103, 110 (2d Cir. 2007)(Disparities among co-defendants in the case may properly be considered, but only if the court considers not only the similarities among co-defendants but also the differences, and why the fact that the defendant is "similarly situated…would matter in light of the differences.")

## VI. REDEMPTION

Christopher has taken full responsibility for his actions and is ashamed and embarrassed that he participated in this offense. Amidst the uncertainty in Christopher Marino's life, exists a person that is more than capable of redemption. He has expressed remorse for his conduct and is reflective about his past actions. Christopher is scared about his future, and he has acknowledged that he will need to ask for help and support, in order to cope with the uncertainty. He has the love of very close friends, one of whom is his current employer, as well as his mother.[2] It is clear that the one trait that stands out most from their perspectives, is trust. They

---

[2] See "Letters from Family" attached as Exhibit A.

9

speak about how much they can trust him. They understand his life and know that his participation in the instant offense is an aberration.

    Redemption is a quality that one must fight for in a very personal way. Christopher is using this time to do what he has spent a lifetime doing – being resilient in the face of change and turmoil and adapting to a new set of circumstances. He is on the road to redemption and is engaging in this fight in a very courageous and direct manner. We respectfully ask that Christopher Marino be allowed the opportunity to remain on that road and engage in that fight. A sentence of time served would allow Christopher to continue in meaningful employment as he resiliently remains on a quest for redemption. Accordingly, we request a total sentence of time served and 1 year of supervised release.

                                            Respectfully,

                                            Karloff C. Commissiong
                                            *Attorney for Christopher Marino*

cc:    A.U.S.A. David Felton (via email)
        A.U.S.A. Sarah Mortazavi (via email)

# Exhibit A

## Letters from Friends and Family

Friends: Jennifer Padula, Nancy Gregos and Julie Tedford

Family – Mother: Barbara Colson Marino

Consider It Done, Inc.
Cleanouts & Removal



February 5, 2024

Honorable Mary Kay Vyskocil
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

RE: Christopher Marino

Dear Judge Vyskocil,

My name is Jennifer Padula. I have owned and operated the above-mentioned cleanout company since 1988 and am a life-long resident of NJ, residing at the above address for over 22 years. I met Mr. Marino about 20 years through a close friend and business associate, Julie Tedford. Until recently I saw Mr. Marino on occasion at social gatherings over the years. In the Spring & Summer of 2020, he regularly accompanied Ms. Tedford to our warehouse/office to help her with the repurposing of the household items that were removed from customers' homes. Soon after getting to know him better, I offered Mr. Marino a job as my Field Coordinator, which essentially means he represents my company at customers' homes by coordinating and supervising the various subcontractors whom I hire to either remove and repurpose and/or remove and dispose of the items the homeowner has hired us to have removed. His role is to ensure that the subcontractors are meeting the customers' needs professionally, respectfully, efficiently and with minimal risk for damage.

Not long after I hired Mr. Marino, I downsized, mainly to minimize the need to manage staff. Mr. Marino's work ethic, honesty, and willingness to be helpful have been a refreshing asset to both me and the company. He is reliable, committed, willing to learn, and most importantly trustworthy. The service we provide requires us to work in customers' homes, in their personal space, and often with their valuables and belongings within arm's reach. Therefore, when employing field staff, trust is paramount. The feedback I receive regularly from my customers is that he represents my company in a respectful and professional manner. I haven't received any negative feedback since I hired him.

In addition to the peace of mind he affords me as a business owner, I have enjoyed a close friendship with Chris as well. We go to dinner, have attended a few concerts/shows together, go to the beach and BBQ together with friends, and check in on each other regularly. He's a good guy who's fun to be around. He's cared for my elderly dog who fell ill while I was out of the state, is helping me prepare to move and sell my home, helps my mother with various things around the house, and given his closer proximity to where my mom lives, run errands for her and looks in on her for me when I am travelling. Also, while I'm traveling, Chris insists on checking on my home and taking in the mail, and I rely on him to keep an eye on work related things for me as well.

What I find most refreshing about Chris are his candor, his character, and the levity he injects into every aspect of his life. I have come to know a good man who is taking responsibility. It is my sincere hope that you take this letter into consideration at the time of sentencing. I believe Chris to be a valuable member of our community, and my business, who genuinely wants to do the right thing.

Sincerely,

*J. Padula*

Jennifer Padula
Owner/President



February 9, 2024

Honorable Mary Kay Vyskocil
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

**RE:   Christopher Marino**

Dear Judge Vyskocil:

I hope this letter finds you well. I met Christopher Marino in 1978 when he was 15. I was 28 years old. I owned and operated a horse training facility at the time that was in Howell, NJ. Chris was hired to work on the farm as a groom by one of my tenants. Even at the age of 15, he was a wonderful, trustworthy, dependable employee. He always showed up to work after school and on the weekends. As the years went on, he was more the son I never had. We became close and worked together in the horse industry for many years. His work ethic, dependability, and trustworthiness continued through the years. He was a member of my family. I was married with two daughters, and he was always a constant in my children's lives, to this day he has been an uncle figure in their lives.

In the mid-1990s Chris moved into our home for some time. There were several periods that Chris would live with us until he moved in permanently in 2016. He has been an impeccable tenant. Again, very trustworthy, dependable, loyal, etc. His rent is $800.00 a month and he always pays his rent on time. Now at this age in my life, I am in my 70's. I am widowed and my children are married with their own families. Chris helps me maintain my home, helps me with day-to-day household chores, and anything else needed for my care or the care of my home. Chris is a remarkable person. He comes from a wonderful family, whom I have known and been close to since I met Chris in 1978. He helps care for his mother, taking her to doctor's visits, etc. As you can see, I cannot say enough good things about him. He is a real asset as a friend and tenant.

If you should have any further questions, please feel free to reach out to me.

Be Well,

**Nancy Gregos**



February 8, 2024

Honorable Mary Kay Vyskocil
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

RE: Christopher Marino

Dear Judge Vyskocil,

My name is Julie Tedford and I'd like to offer a character reference for Christopher Marino. When I first came to NJ over 40 years ago in 1983, Chris was the first person I met after driving cross country. He was kind and generous and helped me find a place to live. There were periods of time throughout our friendship when we'd lose touch, but we'd reconnect as if no time had passed.

Chris is someone I've always been able to rely on and is one of the most selfless people I know. Any time I reach out to him for help, he is always there for me, as he is for others, including his 85-year-old mom who relies on Chris to help manage her health and doctors' appointments. I've known Chris' mom for over 40 years as well. She's a tough cookie but makes no apologies for Chris being her favorite child.

In the early 2000's I worked for Chris for a while grooming and massaging horses. I've worked for many other trainers over the years and not many would care enough to help their horses in that way. I enjoyed working for Chris because his stable was always tidy, the horses well cared for, and the atmosphere fun.

All of these years later, not much has changed. He's still a fun, reliable, generous, and trustworthy friend that I'm happy to have back in my life full-time.

I do hope that my letter helps shed some light on the true character of a man I've known for over 4 decades who made a mistake that he sincerely wants to put behind him.

Kind Regards,

Julie Tedford



February 14, 2024

Honorable Mary Kay Vyskocil
Daniel Patrick Moynihan
United States, Courthouse
500 Pearl St.
New York, NY 10007–1312

RE: Christopher Marino

Dear Judge Vyskocil

My name is Barbara Marino, the mother of Christopher Marino. I reside at the above listed address, and have so for almost 4 years. I previously lived in the Jackson/Howell. area of New Jersey for approximately 56 years. I was born in Staten Island, New York. I am a retired credit manager of an Anheuser Busch wholesaler. I was employed there for 31 years. At 85 years old, and a very private person, I find it difficult to write this letter, but realizing how important it is, I will do my best.

In 1962 I met and married Chris's father John Marino Sr., a welder and part time rodeo calf roper. John was a widower with a two year old son, John Jr. Chris was born on New Year's Day 1963 followed by his brother Harley in 1965. When Chris was 10 months old we purchased a small home in Howell, NJ on 2 acres of land with a barn. His father kept a few horses there for his calf roping. As a toddler, Chris could always be found in the barn whenever his dad was in there. his love for horses started at that time. In 1966 we sold that property and purchased a farm with 8 acres also in Howell. Shortly after we moved, my husband decided he wanted to pursue a career as a Farrier. He attended a school in Tennessee for I believe was a three month course. The boys and I remained in NJ caring for the few animals that we had on the farm. After finishing his schooling, he returned home and advised me that he no longer wanted to be married, and wanted to be free of having a family. We sort councelling but after a frustrating year, I filed for divorce. When the divorce became final, I was granted, full custody of all three boys, as the judge felt even though I never legally adopted John Jr. he would have a more stable life living with me and his brothers. John Sr. never contested the divorce and so we moved on. The farm was sold, and the boys and I moved to an apartment complex in Jackson NJ. Their father provided for them and we did our best to make sure the boys had a proper upbringing and tried to spend holidays together as a family. They spent every other weekend with their father.. When they were in their teens he moved to Texas and opened a successful farrier supply business. I remained cordial with him until his passing three years ago.

Raising three rambunctious boys was not an easy task, but I managed. John Jr, went into the Navy after graduation, and today is a semi retired chef, who is married and lives in Toms River, NJ. Harley, who

followed Chris into the horse, business married young, then went into the army, he is a disabled veteran and he and his wife reside in PA..

Chris never gave me any problems growing up. He was a good student who had a newspaper route. The apartment complex where we lived had several seniors citizens living there. He was always available to run errands, wash their cars and clean off their cars when we had snow storms. He was an all round good kid with an outgoing personality, and a great sense of humor.

When Chris was about 14 years old, his school bus driver mentioned to him that her husband trained harness racing horses, this sparked his interest. Upon learning where the trainer kept his horses he went to pay him a visit, His name was Eddie Morris. I remember when he came home that day and told me he had gotten a job working weekends, cleaning stalls, and helping take care of the horses. After working just a few short months, he told me that he knew what he wanted to do with his life and that was become a horse trainer. He worked really hard and was a quick learner and spent every waking hour either working or reading books about harness racing. When he was 16, he persuaded me against my better judgment to let him drop out of school and pursue his dream. He worked for Eddie Morris and a few more trainers learning as much as he could, and finally in his mid to late 20s went out on his own.

Running a horse racing stable, is not an easy job, Chris worked very long hours, and had a great work ethic. He built up a nice business and in the early 2000s he had a stable of close to 100 horses with many well-known owners. At that time he was one of the top harness racing trainers in the country. He was very well respected by his peers. Chris has never been one to stand by and let others do the work. He wasn't afraid to get his hands dirty and would work side-by-side with his employees. He ran a tight ship and always made sure that his horses came first. He won several big races, which is a hard thing for any trainer to do. He also mentored several young trainers and drivers along the way. He was always ready to to give someone looking to break into the business a chance.eHe always remembered how Eddie Morris gave him his start many years ago.

Four years ago my life changed when I was in a very serious car accident. I gave up driving, sold my home and purchased a mother/daughter home with my granddaughter and her family in New Egypt NJ. She works full-time and has two small children. Always independent now at 85 I have some health issues and I depend on Chris to take me to doctor visits and therapy for my legs when I need it. With the job he has now, he is able to arrange his schedule when I need him to. Of my three sons he is the only one that is able to help me out. My oldest son John suffered a heart attack and had open heart surgery last year. My youngest son Harley, as I stated before is a disabled veteran and cannot drive.

I know I raised a good man, a good man, who used very poor judgement and made a terrible mistake. He is trying to pick up the pieces of his life and has a good support system behind him. I hope I haven't rambled on too much. I sincerely hope that you take this letter into consideration when sentencing him.

Sincerely

*Barbara Marino*

Barbara Marino